1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | |
|---|---|
| HARRISON MA, on his own behalf and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NIKE, INC.,<br><br>Defendant. | Case No.: 2:25-cv-01235-JLR<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Harrison Ma, on his own behalf and on behalf of others similarly situated, on information and belief except to his own experiences and matters of public record, complains of Defendant Nike, Inc., as follows:

## I.    INTRODUCTION

1.    In 1998, to protect Washington consumers from the annoyance and harassment caused by the burgeoning spam email industry, the Washington State Legislature enacted the Commercial Electronic Mail Act (CEMA), codified at chapter 190 of title 19 of the Revised Code of Washington (RCW).

2.    Among other things, CEMA prohibits transmitting a commercial email to a Washington resident's email address that "[c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

3.    Defendant Nike, Inc., does just what CEMA prohibits.

**Smith & Dietrich Law Offices PLLC**
1226 State Avenue NE, Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

4.    Nike bombards Washington consumers, including Plaintiff, with commercial emails whose subject lines employ various tactics to create a false sense of urgency in consumers' minds—and ultimately, from consumers' wallets.

5.    This false urgency wastes consumers' time by enticing them to engage with Nike's marketing for fear of missing out and chokes consumers' email inboxes with repeated false notifications that the time to act—*i.e.*, *purchase*—is short.

6.    And through this deceptive time-sensitivity, Nike falsely narrows the field— steering consumers away from shopping for better deals—to its own products that must be purchased *now*.

7.    Plaintiff challenges Nike's harassment of Washington consumers with deceptive marketing for violations of the Commercial Electronic Mail Act (RCW 19.190.020) and the Consumer Protection Act (RCW 19.86.020) for injuries caused, additionally seeking injunctive relief against such violations in the future.

## II.    JURISDICTION AND VENUE

8.    Defendant has invoked this Court's jurisdiction under 28 U.S.C. §§ 1332 and 1367. *See* ECF No. 1.

9.    Venue is proper in the Western District of Washington, Seattle Division, under 28 U.S.C. § 1441 because this district and division embrace the place from which Defendant removed this action, King County Superior Court.

## III.    PARTIES

10.    Plaintiff Harrison Ma is a resident of King County, Washington.

11.    Defendant Nike, Inc., is a corporation incorporated under the laws of Oregon with its principal place of business at One Bowerman Drive, Beaverton, OR 97005.

## IV.    FACTUAL ALLEGATIONS

### A.    CEMA protects Washington consumers from deceptive spam emails.

12.    The Supreme Court of Washington has made clear: "[A]ll Internet users … bear the cost of deceptive spam." *State v. Heckel*, 143 Wn. 2d 824, 835 (2001) (*en banc*).

AMENDED CLASS ACTION COMPLAINT - 2
Case No. 2:25-cv-01235-JLR

**Smith & Dietrich Law Offices PLLC**
1226 State Avenue NE, Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

13.     In 1998, the Legislature found that the "volume of commercial electronic mail" was "growing," generating an "increasing number of consumer complaints." Laws of 1998, ch. 149, § 1.

14.     In the nearly three decades since, the problems caused by unsolicited commercial email, *i.e.* spam email, have grown exponentially.

15.     And the problems are not limited to email content. Subject lines of emails are framed to attract consumers' attention away from the spam barrage to a message that entices consumers to click and, ultimately, *purchase*.

16.     In 2003, the United States Congress found that "[m]any senders of unsolicited commercial electronic mail purposefully include misleading information in the messages' subject lines in order to induce the recipients to view the messages." 15 U.S.C. § 7701(a)(8).

17.     In 2012, one study estimated that Americans bear "costs of almost $20 billion annually" due to unsolicited commercial email. Justin M. Rao & David H. Reiley, *The Economics of Spam*, 26 J. of Econ. Perspectives 87, 88 (2012).

18.     Even when bulk commercial email marketers are operating under color of consumer consent, the reality is that "[m]ost privacy consent"—especially under the "notice-and-choice" approach predominant in the United States—"is a fiction." Daniel J. Solove, *Murky Consent: An Approach to the Fictions of Consent in Privacy Law*, 104 Boston Univ. L. Rev. 593, 596 (2024).

19.      Consumers therefore routinely "consent" to receive flurries of commercial emails which they did not meaningfully request and in which they have no genuine interest.

20.     This includes emails sent to consumers from businesses with which they have no prior relationship—by virtue of commercial data brokers and commercial data sharing agreements.

21.     Simply conducting the routine affairs of daily life often exposes consumers to unanticipated and unwanted volumes of commercial email. "Nowadays, you need an email address for everything from opening a bank account to getting your dog's nails trimmed, and … [o]nce you hand over your email address, companies often use it as an all-access pass to your inbox: Think of shopping websites that send account updates, deals, 'we miss you' messages, and holiday

AMENDED CLASS ACTION COMPLAINT - 3
Case No. 2:25-cv-01235-JLR

**Smith & Dietrich Law Offices PLLC**
1226 State Avenue NE, Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

promotions throughout the year. It's too much." Kaitlyn Wells, *Email Unsubscribe Services Don't Really Work*, N.Y. Times Wirecutter (Aug. 19, 2024), https://perma.cc/U8S6-R8RU/.

22.    The Legislature presciently intended CEMA to "provide some immediate relief" for these problems by prohibiting among other things commercial emails that "contain untrue or misleading information in the subject line." Laws of 1998, ch. 149, § 1.

23.    CEMA thereby protects Washington consumers against the "harms resulting from deceptive commercial e-mails," which "resemble the type of harms remedied by nuisance or fraud actions." *Harbers v. Eddie Bauer, LLC*, 415 F. Supp. 3d 999, 1008 (W.D. Wash. 2019).

24.    CEMA's "truthfulness requirements" increase the costs of sending deceptive commercial emails and thereby reduce their volume. *Heckel*, 143 Wn. 2d at 836.

25.    CEMA's "truthfulness requirements" thereby advance the statute's aim of protecting consumers "from the problems associated with commercial bulk e-mail" while facilitating commerce "by eliminating fraud and deception." *Id.*

26.    CEMA "mean[s] exactly what it says": in "broad" but "patently clear" language, CEMA unambiguously prohibits "sending Washington residents commercial e-mails that contain *any* false or misleading information in the subject lines of such e-mails." *Certification from U.S. Dist. Ct. for W. Dist. of Wash. in Brown v. Old Navy, LLC*, 567 P.3d 38, 44, 46–47 (Wash. 2025).

27.    CEMA's protections do not depend on whether any email was (really or fictively) solicited by consumers, nor on whether consumers relied on any false or misleading statement contained in its subject line. *See Harbers*, 415 F. Supp. 3d at 1011.

28.    The statute's only concern is to suppress false or misleading information in the subject line of commercial emails. *See Brown*, 567 P.3d at 44–45.

**B.    The subject lines of Nike's marketing emails make false time scarcity claims.**

29.    One common way online marketers "manipulate consumer choice by inducing false beliefs" is to create a false sense of urgency or to falsely claim that consumers' time to act is scarce. Fed. Trade Comm'n, *Bringing Dark Patterns to Light* 4 (2022), https://perma.cc/847M-EY69/; *see*

---

AMENDED CLASS ACTION COMPLAINT - 4
Case No. 2:25-cv-01235-JLR

**Smith & Dietrich Law Offices PLLC**
1226 State Avenue NE, Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

*also* U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 26 (2022), https://perma.cc/V848-7TVV/.

30. The FTC has identified the "False Limited Time Message" as one example of false time scarcity claims, in which the marketer creates "pressure to buy immediately by saying the offer is good only for a limited time or that the deal ends soon—but without a deadline or with a meaningless deadline that just resets when reached." *Bringing Dark Patters to Light*, *supra* para. 29, at 22.

31. False scarcity claims are psychologically effective. As "considerable evidence" suggests, "consumers react to scarcity and divert their attention to information where they might miss opportunities." *Online Choice Architecture*, *supra* para. 29, at 26.

32. Invoking this time pressure achieves a seller's aim to narrow the field of competitive products and deals, by "induc[ing] consumers to rely on heuristics (mental shortcuts), like limiting focus to a restricted set of attributes or deciding based on habit." *Id.*

33. Under time pressure, "consumers might take up an offer to minimise the uncertainty of passing it up." *Id.*

34. False time scarcity claims thus *harm consumers* by manipulatively distorting their decision-making to *their detriment—and the seller's benefit*.

35. Indeed, one 2019 study found that "customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited." *Id.* at 27.

36. False time scarcity claims also harm market competition. Consumers learn to ignore scarcity claims, "meaning that when a product [or offer] is truly scarce, the seller will not be able to credibly communicate this information." *Id.*

37. These false time scarcity claims are a staple of Nike's email scheme to corral consumers to purchase its products, as the following examples demonstrate.

38. For example, on June 10, 2022, Nike sent consumers a mass email with the subject line, "2 days only: Save up to 50% 😲". This subject line states that discounts of up to 50 percent will be available for two days, June 10 and June 11, as confirmed by the body of the email.

AMENDED CLASS ACTION COMPLAINT - 5
Case No. 2:25-cv-01235-JLR

**Smith & Dietrich Law Offices PLLC**
1226 State Avenue NE, Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

39.     The subject line of the June 10 email was false or misleading. As subsequent emails illustrate, Nike intended to and did extend the same offer until June 18.

40.     On June 12, the day after the "up to 50%" off offer was supposed to end, Nike sent consumers a mass email with the subject line, "Save up to 50% on new markdowns 👀". The body of the email represented that the "up to 50%" off offer was good through June 18.

41.     On June 18, Nike sent consumers a mass email with the subject line, "New markdowns going fast 🕙". But the products were not in fact "going fast"; as the body of the email reveals, the email was simply announcing the conclusion of the June 10 through June 18 "up to 50%" off sale.

42.     For another example, on August 24, 2022, Nike sent consumers a mass email with the subject line, "[Name], save up to 50% 🔥 ". The body of the email announced a sale of "up to 50%" off.

43.     On August 26, Nike sent consumers a mass email with the subject line, "Up to 50% off disappears tonight ⌛ ".

44.     The subject line of the August 26 email was false or misleading. As subsequent emails illustrate, Nike intended to and did extend the "up to 50% off" offer for another day.

45.     On August 27, Nike sent consumers a mass email with the subject line, "One extra day to save 👀". The body of the email extended the "up to 50% off" offer until the end of the day.

46.     For another example, on July 9, 2023, Nike sent an email with the subject line, "The Ultimate Sale starts now 🤩". The body of the email announced a sale of "up to 60%" off.

47.     On July 15, Nike sent an email with the subject line, "THE Ultimate Sale Ends tonight: Save up to 60% 💎 ".

48.     The subject line of the July 15 email was false or misleading. As subsequent emails illustrate, Nike intended to and did extend the same offer for almost an entire month, until August 12.

49.     On July 16, the day after the "Ultimate Sale" was to end according to the subject

**Smith & Dietrich Law Offices PLLC**
1226 State Avenue NE, Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

line of the July 15 email, Nike sent an email with the subject line, "[Name], one extra day to save ✳️". The body of the email announced the extension for "an extra day" of the "Ultimate Sale."

50.    On August 4, Nike sent an email with the subject line, "Two days left to save 🔔". The body of the email extended the same "up to 60%" off offer as the "Ultimate Sale," now rebranded as the "Back to School Sale."

51.    The subject line of the August 4 email was false or misleading. As subsequent emails illustrate, Nike intended to and did extend the same offer for more than a week, until August 12.

52.    On August 6, the day after the "up to 60%" off sale was to end according to the subject line of the August 4 email, Nike sent an email with the subject line, "We're not done yet—save up to 60% 👣".

53.    On August 12, nearly a month after the initial July 15 email, Nike sent an email with the subject line, "Back to School Sale ends TONIGHT 🕐". This email finally brought to conclusion the "up to 60%" off sale announced in the July 15 email's subject line as ending that day.

54.    For another example, Nike announced its 2024 "Black Friday" sale on November 17, 2024, by sending an email with the subject line, "Early Access to Black Friday is here". The body of the email announced a sale of "up to 60% off."

55.    Nike's Black Friday email marketing continued with further emails on November 20, November 23, November 24, November 28, and November 29 (the date of Black Friday).

56.    On November 30, Nike sent an email with the subject line, "Only a few hours left". The body of the email indicated that the subject line referred to the "up to 60% off" Black Friday sale.

57.    The subject line of the November 30 email was false or misleading. As subsequent emails illustrate, Nike intended to and did extend the same offer for another week, until December 7.

AMENDED CLASS ACTION COMPLAINT - 7
Case No. 2:25-cv-01235-JLR

**Smith & Dietrich Law Offices PLLC**
1226 State Avenue NE, Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

58.     On December 1, Nike sent an email with the subject line, "Cyber Monday is here". The body of the email extended the same "up to 60% off" offer as the Black Friday sale, now rebranded as the "Cyber Monday" sale.

59.     The subject line of the December 1 email was false or misleading, as it implied that the offer contained in the email's body was for a one-day "Cyber Monday" event. As subsequent emails illustrate, Nike intended to and did extend the same offer for almost another week, until December 7.

60.     On December 3, Nike sent an email with the subject line, "Cyber Monday continues". The body of the email made the same "up to 60% off" offer Nike had been making since November 17.

61.     On December 7, Nike sent an email with the subject line, "Jump on these deals". This email finally brought to conclusion the "up to 60% off" sale announced in the November 17 email's subject line, represented as ending in "a few hours" in the November 30 email's subject line, and implied to be ending *again* in the December 1 email's subject line.

62.     These and other examples of Nike's commercial emails whose subject lines contain false or misleading statements are attached to this Class Action Complaint as Exhibit A.

**C.     Nike knows when it sends marketing emails to addresses held by Washington residents.**

63.     A sophisticated commercial enterprise, like Nike, which is engaged in persistent marketing through mass email campaigns across the United States, has several ways of knowing where the recipients of its marketing emails are located. The means it employs are peculiarly with its knowledge.

64.     First, the sheer volume of Nike's email marketing (averaging 475 separate pieces per year between 2014 and 2024, or 1.3 per day, sent to a mailing list numbering at minimum in the thousands) permits an inference that Nike knew Washington residents would receive its emails.

65.     Second, Nike may obtain location information tied to email addresses when consumers make purchases from Nike through digital platforms, including Nike's website, or

AMENDED CLASS ACTION COMPLAINT - 8
Case No. 2:25-cv-01235-JLR

**Smith & Dietrich Law Offices PLLC**
1226 State Avenue NE, Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

1    otherwise self-report such information to Nike.

2        66.    Third, Nike may obtain location information tied to email addresses by tracking the

3    IP addresses of devices used to open Nike's emails, which in turn can be correlated to physical

4    location (as illustrated, for example, by the website https://whatismyipaddress.com/).

5        67.    Specifically, Nike appears to use Salesforce Marketing Cloud to manage its email

6    marketing campaigns. This platform allows Nike to identify anyone who receives its marketing

7    emails, determine who opens them, and track who clicks on any links within them.

8        68.    Nike is likely able to infer the general geographic location of recipients by state

9    based on their IP address at the time of email open or link click.

10        69.    Fourth, Nike may obtain location information tied to email addresses by purchasing

11    consumer data from commercial data brokers such as Acxiom, Oracle, and Equifax, which sell

12    access to databases linking email addresses to physical locations, among other identifiers.

13        70.    Fifth, Nike may obtain location information tied to email addresses by using

14    "identity resolution" services offered by companies such as LiveRamp, which can connect

15    consumers' email addresses to their physical locations, among other identifiers.

16        71.    Sixth, Nike may obtain information that the recipients of its marketing emails are

17    Washington residents because that information is available, upon request, from the registrant of

18    the Internet domain names contained in the recipients' email addresses. *See* RCW 19.190.020(2).

19        72.    It is thus highly probable that a seller of Nike's size and sophistication employs not

20    just one but several means of tying consumers' email addresses to their physical locations, at least

21    at the state level, and that Nike knows when it sends marketing emails to Washington residents.

22    **D.    Nike has violated Plaintiff's right under CEMA to be free from deceptive**

23        **commercial emails.**

24        73.    Nike has bombarded Plaintiff Ma with commercial emails whose subject lines

25    contain false or misleading statements in violation of his right to be free from such annoyance and

26    harassment under CEMA.

27        74.    For example, Ma received the series of emails Nike sent in August 2022 relating to

**Smith & Dietrich Law Offices PLLC**
1226 State Avenue NE, Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

the "up to 50% off" sale described at paragraphs 42 to 45 above, as well as the November and December 2024 emails relating to the Black Friday and Cyber Monday sale described at paragraphs 54 to 61 above.

75.    Among these emails, the subject lines of the August 26, 2022, November 30, 2024, and December 1, 2024, emails were false or misleading in violation of CEMA, as described at paragraphs 44, 57, 59 above.

76.    Ma received the August 26, 2022, "Up to 50% off disappears tonight ⌛ " email at his personal Gmail account the same day at 6:22 a.m. PT.

77.    Ma received the November 30, 2024, "Only a few hours left" email at his personal Gmail account the same day at 3:45 a.m. PT.

78.    Ma received the December 1, 2024 "Cyber Monday is here" email at his personal Gmail account the same day at 4:41 a.m. PT.

79.    These email subject lines contained false statements of fact as to the "duration or availability of a promotion." *Brown*, 567 P.3d at 47.

## V.    CLASS ALLEGATIONS

80.    Plaintiff brings this action under Civil Rule 23 on behalf of the following putative class ("Class"):

> All Washington citizens holding an email address to which Defendant sent or caused to be sent any email listed in Exhibit A during the Class Period.

81.    Excluded from the Class are Defendant's officers, directors, and employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiff; and all judges and court staff to whom this action may be assigned, as well as their immediate family members

82.    The Class Period extends from the date four years before Plaintiff's initial Class Action Complaint was filed to the date a class certification order is entered in this action.

83.    Plaintiff reserves the right to amend the Class definition as discovery reveals

AMENDED CLASS ACTION COMPLAINT - 10
Case No. 2:25-cv-01235-JLR

**Smith & Dietrich Law Offices PLLC**
1226 State Avenue NE, Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

1  additional emails containing false or misleading information in the subject line that Defendant sent
2  or caused to be sent during the Class Period to email addresses held by Washington residents.

3      84.    The Class is so numerous that joinder of all members is impracticable because the
4  Class is estimated to minimally contain thousands of members.

5      85.    There are questions of law or fact common to the class, including without limitation
6  whether Defendant sent commercial emails containing false or misleading information in the
7  subject line; whether Defendant sent such emails to email addresses it knew or had to reason to
8  know were held by Washington residents; whether Defendant's conduct violated CEMA; whether
9  Defendant's violation of CEMA constituted a *per se* violation of the Consumer Protection Act,
10 RCW 19.86.020 (CPA); and whether Defendant should be enjoined from such conduct.

11     86.    Plaintiff's claims are typical of the Class's because, among other reasons, Plaintiff
12 and Class members share the same statutory rights under CEMA and the CPA, which Defendant
13 violated in the same way by the uniform false or misleading marketing messages it sent to all
14 putative members.

15     87.    Plaintiff will fairly and adequately protect the Class's interests because, among
16 other reasons, Plaintiff shares the Class's interest in avoiding unlawful false or misleading
17 marketing; has no interest adverse to the Class; and has retained competent counsel extensively
18 experienced in consumer protection and class action litigation.

19     88.    Defendant has acted on grounds generally applicable to the Class, in that, among
20 other ways, it engaged in the uniform conduct of sending uniform commercial emails to Plaintiff
21 and the Class, which violate CEMA and the CPA in the same way, and from which it may be
22 enjoined as to Plaintiff and all Class members, thereby making appropriate final injunctive relief
23 with respect to the Class as a whole.

24     89.    The questions of law or fact common to the members of the Class predominate over
25 any questions affecting only individual members, in that, among other ways, Defendant has
26 violated their rights under the same laws by the same conduct, and the only matters for individual
27 determination are the number of false or misleading emails received by each Class member and

AMENDED CLASS ACTION COMPLAINT - 11
Case No. 2:25-cv-01235-JLR

**Smith & Dietrich Law Offices PLLC**
1226 State Avenue NE, Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

that Class member's resulting damages.

90.      A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among other reasons, the claims at issue may be too small to justify individual litigation and management of this action as a class action presents no special difficulties.

## VI.    CLAIMS TO RELIEF

### First Claim to Relief

### Violation of the Commercial Electronic Mail Act, RCW 19.190.020

91.      Plaintiff incorporates and realleges paragraphs 1–79 above.

92.      CEMA provides that "[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message … to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that … [c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

93.      Defendant is a "person" within the meaning of CEMA. RCW 19.190.010(11).

94.      Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of "commercial electronic mail messages" within the meaning of CEMA. RCW 19.190.010(2).

95.      Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents, including because Defendant knew that Plaintiff and putative members were Washington residents through "information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address". RCW 19.190.020(b)(2).

96.      Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

AMENDED CLASS ACTION COMPLAINT - 12
Case No. 2:25-cv-01235-JLR

**Smith & Dietrich Law Offices PLLC**
1226 State Avenue NE, Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

97.    For Defendant's violation of CEMA, Plaintiff is entitled to all available relief, including an injunction against further violations.

**Second Claim to Relief**

**Violation of the Consumer Protection Act, RCW 19.86.020**

98.    Plaintiff incorporates and realleges paragraphs 1–79 above.

99.    The CPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020.

100.    A violation of CEMA is a *per se* violation of the CPA. RCW 19.190.030.

101.    A violation of CEMA establishes all the elements necessary to bring a private action under the CPA. *Wright v. Lyft*, 189 Wn. 2d 718 (2017).

102.    CEMA provides that "[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message … to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that … [c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

103.    Defendant is a "person" within the meaning of CEMA. RCW 19.190.010(11).

104.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of "commercial electronic mail messages" within the meaning of CEMA. RCW 19.190.010(2).

105.    Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents, including because Defendant knew that Plaintiff and putative members were Washington residents through "information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address". RCW 19.190.020(b)(2).

106.    Defendant initiated the transmission, conspired with another to initiate the

**Smith & Dietrich Law Offices PLLC**
1226 State Avenue NE, Suite 205
Olympia, WA 98506
Tel. (360) 915-6952

transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

107.    For Defendant's violation of the CPA, Plaintiff and putative members are entitled to an injunction against further violations; the greater of Plaintiff's actual damages or liquidated damages of $500 per violation, trebled; and costs of the suit, including reasonable attorneys' fees.

## VII.    JURY DEMAND

108.    Plaintiff demands a jury trial on all issues so triable.

## VIII.    PRAYER FOR RELIEF

Plaintiff asks that the Court

A.    Certify the proposed Class, appoint Plaintiff as Class representative, and appoint undersigned counsel as Class counsel;

B.    Enter a judgment in Plaintiff's and the Class's favor permanently enjoining Defendant from the unlawful conduct alleged;

C.    Enter a judgment in Plaintiff's and the Class's favor awarding actual or liquidated damages, trebled, according to proof;

D.    Award Plaintiff costs of suit, including reasonable attorneys' fees; and

E.    Order such further relief the Court finds appropriate.

DATE: August 27, 2025                            Respectfully submitted,

/s/ *Walter M. Smith*
Walter M. Smith, WSBA No. 46695
**Smith & Dietrich Law Offices, PLLC**
1226 State Avenue NE, Suite 205
Olympia, WA 98506
Tel.: (360) 915-6952
walter@smithdietrich.com

AMENDED CLASS ACTION COMPLAINT - 14
Case No. 2:25-cv-01235-JLR

Lynn A. Toops*
Natalie A. Lyons*
Ian R. Bensberg*
**CohenMalad, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel.: (317) 636-6481
ltoops@cohenmalad.com
nlyons@cohenmalad.com
ibensberg@cohenmalad.com

J. Gerard Stranch, IV*
**Stranch, Jennings & Garvey, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel.: (615) 254-8801
gstranch@stranchlaw.com

Samuel J. Strauss, WSBA No. 46971
**Strauss Borrelli, LLP**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Tel.: (872) 263-1100
sam@straussborrelli.com

*Attorneys for Plaintiff*
* Admitted *pro hac vice*

AMENDED CLASS ACTION COMPLAINT - 15
Case No. 2:25-cv-01235-JLR

**Smith & Dietrich Law Offices PLLC**
1226 State Avenue NE, Suite 205
Olympia, WA 98506
Tel. (360) 915-6952